**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2205
_____

DOMINICK DENAPLES and MARY ANN DENAPLES,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

No. 14357-08


LOUIS DENAPLES and  BETTY A. DENAPLES,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

No. 14359-08

Dominick DeNaples, Mary Ann DeNaples,
Louis DeNaples, and Betty A. DeNaples,
Appellants

—————————

On Appeal from the United States Tax Court
(T.C. 14357-08; T.C. 14359-08)
Tax Judge:  Honorable Arthur L. Nims III

—————————

Argued November 16, 2011

—————————

Before:  FUENTES, CHAGARES, *Circuit Judges*, and
RESTANI, *Judge*[*]

(Opinion Filed: March 19, 2012)

Layla J. Aksakal
David B. Blair
Alan I. Horowitz **(Argued)**
Joel C. Weiss
Miller & Chevalier
655 Fifteenth Street, N.W.
Suite 900
Washington, DC 20005

Barry H. Frank
Archer & Greiner
1650 Market Street
One Liberty Place, 32nd Floor
Philadelphia, PA 19103

———————————————————

[*]     Honorable Jane A. Restani, Judge of the United States Court of International Trade, sitting by designation.

2

*Counsel for Petitioners-Appellants Betty DeNaples, Dominick DeNaples, Louis DeNaples, Mary Ann DeNaples*

Jonathan S. Cohen
Randolph L. Hutter **(Argued)**
Gilbert Rothenberg
William J. Wilkins
United States Department of Justice
Tax Division
950 Pennsylvania Avenue, N.W.
P.O. Box 502
Washington, DC 20044

*Counsel for Respondent-Appellee Commissioner of Internal Revenue*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*.

Dominick, Louis, Betty, and Mary Ann DeNaples had an interest in real estate in Pennsylvania which the state condemned as part of the construction of the Lackawanna Valley Industrial Highway. To pay for the land, the state agreed to a settlement under which it would pay them $40.9 million, with interest, in five yearly installments. During the first three years of the agreement, the DeNaples excluded this interest from their federal income taxes as tax exempt interest under I.R.C. § 103, which permits exclusion of interest payments that are obligations of the state. The IRS issued to

each couple a deficiency notice for $2.3 million, which was affirmed by the Tax Court. On appeal, the principal issue is whether Section 103 exempts from federal taxation the installment interest paid under an agreement that allowed the state to make yearly payments. We hold that it does.

## I.

The facts are not in dispute and were stipulated to before the Tax Court. Dominick DeNaples and Louis DeNaples were equal partners in D&L Realty, Rail Realty, Inc., F&L Realty, Inc., and Keystone Company.[1] These entities owned an interest in several parcels of real property in Pennsylvania. The Commonwealth of Pennsylvania, through the Pennsylvania Department of Transportation, sought to acquire the property to build the Lackawanna Valley Industrial Highway. In 1993 and 1994, to permit construction to go forward, the State and the DeNaples entered into two Rights of Entry, which permitted the State to enter onto the land but did not alter the DeNaples' entitlement to just compensation.

In 1998, the State initiated condemnation proceedings against the properties in the Pennsylvania Court of Common Pleas by filing a Declaration of Taking pursuant to former 26

---

[1] Dominick DeNaples is married to Mary Ann DeNaples, and Betty DeNaples is married to Louis DeNaples. Each couple filed a joint tax return. For our purposes, they are indistinguishable as Dominick and Louis owned equal shares in the partnership, reported the same interest income, and were issued the same deficiency notice. When we refer to the DeNaples, we refer to them jointly.

Pa. Stat. § 1-402(a). The DeNaples objected, contending that the declaration did not adequately describe the property. The court agreed and dismissed some of the suits. On the remaining suits, a jury trial was commenced and then stayed when the parties indicated that they had settled.

On November 7, 2001, the parties signed a memorandum of intent to settle. The DeNaples agreed that, in exchange for all their ownership interest in all the parcels of land, they would received compensation of approximately $40.9 million, of which $24.6 million would be allocated to principal, and $16.3 million would be allocated to interest ("settlement interest"). There is nothing in the record that indicates why these numbers were selected.

A few months later, the parties entered into a formal settlement agreement. The agreement contained an integration clause, which held that the agreement was the "entire understanding among the parties . . . and supersede[d] all prior and contemporaneous agreements and understandings." JA131.

Because the State lacked sufficient funds available to pay the settlement in full, the DeNaples further agreed to accept the settlement money in five installment payments. By their agreement, each installment payment would be subject to the interest rate set forth in Rule 238(a)(3) of the Pennsylvania Rules of Civil Procedure, which governs the interest rate for tort suits ("installment interest").[2] This

---

[2] The interest rate is "the rate equal to the prime rate as listed in the first edition of the Wall Street Journal published for each calendar year for which the damages are awarded,

5

interest rate changes every year. Under the agreement, the Pennsylvania Court of Common Pleas was to retain jurisdiction and the DeNaples retained the right to pursue any and all remedies should Pennsylvania default. The settlement agreement required that the Court of Common Pleas enter a stipulation as an order of the court, and that the State ensure the action was marked "settled, discontinued and ended as between" the parties.[3]  JA129.

The State made timely and complete payments under the agreement. In fact, Pennsylvania paid the remainder of the amount due in 2005, a full year early. The DeNaples filed income tax returns for tax years 2003 through 2005, and excluded from their gross income a portion of the settlement interest income and all of the installment interest income they had received. As to the settlement interest income, the

---

plus one percent, not compounded." Pa. R. Civ. P. 238(a)(3) (2002). In 2002, the prime interest rate was 4.75%; in 2003, the interest rate was 4.25%; in 2004, it was 4.00%; in 2005, it was 5.25%; in 2006, it was 7.25%. *Money Rates*, Wall St. Journal, Jan. 2, 2002; *Money Rates*, Wall St. Journal, Jan. 2, 2003; *Money Rates*, Wall St. Journal, Jan. 2, 2004; *Money Rates*, Wall St. Journal, Jan. 3, 2005; *Money Rates*, Wall St. Journal, Jan. 3, 2006. Thus, the installment interest rate that Pennsylvania paid for years 2002 through 2006 were 5.75%, 5.25%, 5.00%, 6.25%, and 8.25%, respectively.

[3]     The record before this Court does not contain a copy of the stipulation that the court was to enter. However, it could not modify any provision of the agreement because, according to the terms of the agreement, modification required the written agreement of both parties.

DeNaples received approximately $4.3 million dollars for tax years 2002 through 2004 and approximately $8.7 million for tax year 2005. The DeNaples excluded from their federal gross income any interest received above 6%, contending that anything above this rate was exempt as an obligation of the State under Section 103. As to installment interest, the DeNaples received approximately $1.9 million in 2002, $3.8 million in 2003, $2.2 million in 2004, and $2.7 million in 2005. The DeNaples excluded all the installment interest income from their gross income calculations as exempt under Section 103. In 2008, the IRS issued deficiency notices to the DeNaples. For each couple, the IRS contended that the DeNaples owed an additional $2.3 million dollars in taxes, comprised of $714,019 for tax year 2003, $587,257 for tax year 2004, and $1,023,299 for tax year 2005.

After the parties stipulated to the facts, the United States Tax Court issued a memorandum decision and order finding that no part of the settlement interest or the installment interest was excludable under Section 103. *DeNaples v. Comm'r*, T.C. Memo. 2010-171, at *3 (2010). As to the settlement interest, the Tax Court concluded that the DeNaples had failed to demonstrate that they received interest income above and beyond what was legally required and therefore the settlement interest was not an obligation of the State because it did not invoke the State's borrowing authority. *See id.* at *4. The Tax Court also determined that the parties' allocation of the settlement interest was arbitrary and thus could not be excluded from gross income. *Id.* at *3. As to the installment interest, the Tax Court determined that none of it was excludable under Section 103 because the DeNaples were entitled to it as part of their just compensation

7

requirement.  *Id.* at *4.  The Tax Court entered an order affirming the IRS' deficiency calculations in full.

Shortly thereafter, the DeNaples filed a motion for reconsideration and a motion to vacate.  Notably, they sought to introduce evidence of the prevailing commercial rate to show that some of the settlement interest was excludable. The Tax Court denied both motions, reaffirming its original decision.  It also refused to reopen the record to recompute the DeNaples' deficiencies.  *DeNaples v. Comm'r*, T.C. Memo. 2011-46, at *5 (2011).  The Tax Court held that to do so would require reopening the proceeding, which was inappropriate at that stage.  *Id.*  The DeNaples filed a timely notice of appeal.

## II.

The Tax Court had jurisdiction over the dispute pursuant to 26 U.S.C. §§ 6213(a), 7442.  This Court has appellate jurisdiction pursuant to 26 U.S.C. § 7482(a)(1). Venue is proper in this Circuit because the DeNaples are legal residents of Pennsylvania.  26 U.S.C. § 7482(b)(1)(A).

This Court exercises de novo review over the Tax Court's findings of law, including its construction and application of the Internal Revenue Code.  *PNC Bancorp, Inc. v. Comm'r*, 212 F.3d 822, 827 (3d Cir. 2000).  Factual findings and inferences drawn therefrom are reviewed for clear error.  *Id.*

8

## A. Installment Interest

We first address whether the interest the DeNaples received on each installment payment is excludable from their federal income taxes under Section 103 because it is an "obligation of a State." Section 103 of the Internal Revenue Code holds in relevant part: "gross income does not include interest on any State or local bond." 26 U.S.C. § 103(a). The Code defines a "State or local bond" as "an obligation of a State or political subdivision thereof." *Id.* § 103(c)(1). As a tax exemption, this provision should be construed narrowly. *In re Hechinger Inv. Co. of Delaware, Inc.*, 335 F.3d 243, 259 (3d Cir. 2003) ("As a general rule grants of tax exemptions are given a strict interpretation against the assertions of the taxpayer and in favor of the taxing power but it is equally true that such interpretation may not be so literal and narrow as to defeat the exemptions purpose.") (internal quotation marks omitted).

Some form of Section 103 has been a part of the Tax Code since the passage of the Sixteenth Amendment in 1913. *United States Trust Co. of New York v. Anderson*, 65 F.2d 575, 577 (2d Cir. 1933). Courts have universally recognized that this provision was designed primarily to protect the borrowing power of the states. *Id.*; *see also Stewart v. Comm'r*, 714 F.2d 977, 981 (9th Cir. 1983) (Stewart I); *Drew v. United States*, 551 F.2d 85, 87 (5th Cir. 1977) ("The Supreme Court has made it clear that the purpose of Section 103 is to encourage loans in aid of governmental borrowing power."); *Holley v. United States*, 124 F.2d 909, 911 (6th Cir. 1942).

As the Supreme Court has made clear, what constitutes an "obligation" under the statute should not be "extended to include interest upon indebtedness not incurred under the borrowing power." *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 86-87 (1934). This holding implicitly recognized that the opposite proposition must also be true: that an "obligation" of a State does include indebtedness that is incurred "under the borrowing power." *See id.* In collecting the cases in this field, the Ninth Circuit persuasively reasoned that when a government's obligation to pay interest arises by operation of law, it does not implicate the state's borrowing power, as "taxing the recipient of such interest does not adversely affect the government's ability to borrow money." *Stewart I*, 714 F.2d at 981. Thus, when the state pays interest at a fixed rate pursuant to a statutory or judicial command, it is plainly not excludable under Section 103 of the Internal Revenue Code. On the other hand, when the government's obligation to pay interest arises out of voluntary bargaining, the interest exclusion may play an important role in allowing the state to reduce its borrowing costs. This implicates the state's borrowing authority and may be excludable under Section 103.

With these principles in mind, the first question before us is whether Pennsylvania's interest obligation arose by operation of law or by voluntary bargaining. Because Pennsylvania and the DeNaples negotiated a complete arms-length settlement of Pennsylvania's claims and because the DeNaples agreed to a lower, variable interest rate for the purpose of extending credit to Pennsylvania, we hold that the State's obligation arose by voluntary bargaining, not by operation of law.

10

We recognize that in most Pennsylvania condemnation proceedings, the State's obligation to pay interest arises by operation of law. A condemnee is entitled to just compensation for the taking, which is defined as the difference between the market value of the condemnee's property interest before and after the taking. Former 26 Pa. Stat. §§ 1-601, 1-602. If the State delays in making payment, a condemnee is entitled to interest. *See* former 26 Pa. Stat. § 1-611. The rate of interest to which a condemnee is entitled is not fixed. Indeed, the Pennsylvania Supreme Court has declared the former statute requiring a fixed 6% interest rate unconstitutional. *Hughes v. Dep't. of Transp.*, 523 A.2d 747, 753 (1987). In *Hughes*, the Pennsylvania Supreme Court joined the majority of other states in holding that "if the property owner produces evidence that the six percent rate is constitutionally insufficient, he should be entitled to a higher rate of return as part of just compensation." *Id.* at 753 (internal quotation marks and citations omitted); *see also McGaffic v. Redev. Auth. of New Castle*, 732 A.2d 663, 670 (Pa. Commw. Ct. 1999) (applying the higher prevailing commercial rate after finding that the statutory 6% interest rate did not provide for adequate compensation); *Wasserott v. PennDOT*, 13 Pa. D. & C.4th 593, 595 (Ct. Com. Pl. 1991) ("However, in *Hughes* . . . the Supreme Court refuted the mandatory application of [former 26 Pa. Stat § 1-611]. The [Pennsylvania] Supreme Court, in effect, opened the door for the trial court to determine whether the [State] Code interest rate provides just compensation to the condemnee."). The prevailing commercial rate is different, and usually higher, than the Rule 238 tort rate that the DeNaples and the State selected. *See Hagen v. East Pennsboro Twp.*, 713 A.2d 1187, 1191 (Pa. Commw. Ct. 1998). Thus, at the time the

11

DeNaples were negotiating with Pennsylvania, they were entitled to either 6% or a higher rate.[4]

When the DeNaples and Pennsylvania sat down at the bargaining table to negotiate an arms-length settlement agreement, they did so in the shadow of the ongoing condemnation proceeding with its attendant rights and obligations, including the DeNaples' right to interest for any payment delay. However, when they crafted a total and complete settlement and the DeNaples agreed to take installment payments because the State needed credit, the statutory right to interest became nothing more than a negotiating chip in the DeNaples' pocket. It could be, as it was here, bargained away. *Albrecht v. United States*, 329 U.S. 599, 604 (1947) (when a property owner contracts for the sale of their property to the government "rather than to have 'just compensation,' in the constitutional sense, fixed by the courts, [a court] must look to those terms for the measure of their compensation, including their right to . . . interest."). This transforms the State's interest obligation from a mandatory one to a voluntary one and, thus, alters the Section 103 analysis.[5]

---

[4] In 2006, Pennsylvania enacted a new statute whereby the interest rate for delay damages is the prime interest rate plus 1%. 26 Pa. Cons. Stat. § 713 (2006).

[5] In *Stewart II*, the Ninth Circuit found whether the settlement was entered into because the State needed credit to be a material fact that altered the application of Section 103 to a condemnation settlement. *Stewart v. United States*, 739 F.2d 411, 414 (9th Cir. 1984). The Commissioner attempts to distinguish this case by pointing out that in *Stewart II*,

Thus, we can no longer say that for this particular settlement agreement, the State's obligation to pay interest at a fixed rate arose by operation of law. Instead, the State's obligation to pay interest at the selected rate arose by operation of a freely-negotiated contract that contemplated no further judicial intervention. In this context, the parties were free to select any rate of interest or none at all. As it was undisputed that the State and the DeNaples entered into the installment agreement because the State needed credit, this total and complete settlement was voluntary and thus implicated the State's borrowing authority.

The Commissioner relies heavily on the Sixth Circuit's decision in *Holley v. United States*. This case is not binding on us and, in any event, is distinguishable. In *Holley*, the city was in financial difficulty and needed to defer payment for the condemnee's property. *Holley*, 124 F.2d at 910. The parties fashioned an agreement "providing for the method of payment by the city." *Id.* This settlement agreement became

condemnation proceedings were only threatened while here they had been commenced. This, the Commissioner argues, demonstrates that the transfer was obligatory not voluntary. While the Government is correct that the DeNaples were going to be obligated to sell their property to Pennsylvania, the DeNaples had a choice over the terms by which they did so, including whether they would receive interest and at what rate. They could have proceeded to judgment and obtained a judicially mandated just compensation award with statutory interest. Instead, they voluntary bargained with the State because the State needed an extension of credit to pay any award. Thus, the distinction is not dispositive here.

13

"part of the award itself" that was issued by the court when the condemnation proceeding was completed. *See id.* The DeNaples and Pennsylvania, by contrast, agreed to a total settlement which extinguished the condemnation proceeding. There is no evidence in the record that any condemnation award was ever issued as the settlement agreement makes clear the case was "settled, discontinued and ended." This is critical. The DeNaples and Pennsylvania created an agreement completely separate from the judicial process and the constitutional requirement of just compensation, as such the parties' rights and obligations are defined solely by the agreement's terms. *See Albrecht*, 329 U.S. at 604. In *Holley*, however, the agreement was folded into a just compensation award issued by the court. Therefore, the court in *Holley* was required by law to award interest as part of its judgment, while the DeNaples were free to bargain it away without judicial oversight.

In fact, the DeNaples accepted a lower, variable interest rate than what they were otherwise entitled to. The DeNaples had the right to interest at a presumptive rate of 6% or the prevailing commercial rate, yet agreed to accept a lower, variable interest rate. The State's obligation to pay this amount of interest did not arise by operation of law as there was no statute or judicial decree to pay interest at this rate. Pennsylvania law specifically forbids application of the Rule 238 interest rate to eminent domain proceedings. Pa. R. Civ. P. 238(e)(1)("[Rule 238] shall not apply to . . . eminent domain proceedings." ). Thus, this rate of interest could only apply to this transaction through a private contract, not through a condemnation proceeding.

14

Finally, the purpose underlying Section 103 was well served in this case. The State was able to obtain credit[6] from the DeNaples at a lower rate of interest than it otherwise might have had to if the condemnation proceeding had been completed. In a condemnation proceeding, a court could have imposed a 6% interest rate or the prevailing commercial rate, which can be as much as prime plus 3%. Instead, through its negotiations and in part because of the Section 103 exclusion, the State was able to borrow money from the DeNaples at a lower rate of interest, ultimately aiding the State's borrowing authority and saving it money.

To be clear, we do not hold that any interest payment made pursuant to a voluntary settlement agreement is automatically excludable under Section 103. Rather, it is excludable here because, given the nature of how and what the parties agreed to in the settlement agreement, it is clear that the obligation to pay interest at the Rule 238 rate arose not by operation of law but through the voluntary, arms-length negotiations between the DeNaples and Pennsylvania.

---

[6] By surrendering its property in exchange for a promise of future payments, the DeNaples extended credit to Pennsylvania. Credit is the "provision of . . . goods . . . with the expectation of future payment." Merriam-Webster Online Dictionary, *available at* http://www.merriam-webster.com/dictionary/credit; *see also Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 412 (3d Cir. 2000) ("[T]he definition of 'credit,' however encompasses . . . [the] right granted by a creditor to incur debt and defer its payment. . . .") (internal quotation marks omitted).

15

For these reasons, we hold that the Tax Court erred as a matter of law when it held that the DeNaples should have included the interest they received on the installment payments in their gross income calculation. We, therefore, will reverse the Tax Court's decision on this issue.

## B. Settlement Interest

We next determine whether the Tax Court erred when it held that none of the settlement interest was excludable under Section 103, in part because it refused to reopen the record and accept evidence about the prevailing commercial loan rate. We hold that the Tax Court did not.

In their memorandum of understanding, Pennsylvania and the DeNaples allocated $26 million to principal and $14 million to interest, referred to as settlement interest. This interest was meant to compensate the DeNaples for the delay between the time of the initial Right to Entry and the signing of the settlement agreement. In their tax returns, the DeNaples excluded from their gross income any delay interest in excess of 6%, reasoning that the State was only required to pay 6% and anything above that was a result of the State's voluntary bargaining.

In its initial opinion, the Tax Court found that the allocation between interest and principal was arbitrary and excessive. *DeNaples v. Comm'r*, T.C. Memo. 2010-171, at *3. To the Tax Court, it appeared that the parties had allocated approximately the same ratio of 39.759 percent of the total yearly payment to interest. *Id.* From this, the Court held that the DeNaples were not entitled to exclude any interest from their gross income under Section 103. Despite

16

indicating that too much had been allocated to interest, the Tax Court, on reconsideration, rejected the DeNaples' request to recalculate the deficiency pursuant to Tax Court Rule 155. It held that to recompute would require the introduction of the prevailing commercial rate, which was not in evidence. T.C. Memo. 2011-46 at \*5. Thus, the Tax Court found that the DeNaples had failed to meet their burden of proof that the deficiency was inaccurate. *Id.* We agree.

Under Tax Court Rule 155, "[w]here the Court has filed or stated its opinion determining the issues in a case, it may withhold entry of its decision for purposes of permitting the parties to submit computations pursuant to the Court's determination of the issues, showing the correct amount to be included in the decision." However, this process is not meant to provide litigants an opportunity for retrial or reconsideration. I.R.C. Rule 155(c). Issues considered in a Rule 155 proceeding are limited to "purely mathematically generated computational items." *Blonien v. Comm'r*, T.C. Memo. 2003-308, at \*4 (2003) (quoting *The Home Group, Inc. v. Comm'r*, 91 T.C. 265, 269 (1988), *aff'd on other grounds,* 875 F.2d 377 (2d Cir.1989)). Rule 155 does not allow for the introduction of new evidence that was not before the Tax Court in the original proceeding. *Paccar, Inc. v. Comm'r*, 849 F.2d 393, 400 (9th Cir. 1988). There is no new evidence if "the evidence necessary to resolve a dispute between parties regarding such computations is already in the record or within the scope of the evidence presented in support of issues already pleaded." *Emert v. Comm'r*, 249 F.3d 1130, 1132 (9th Cir. 2001).

Here, there was not sufficient evidence in the record from which the Tax Court could calculate the prevailing

17

commercial rate at the time of the settlement agreement. The Tax Court acknowledged that the prevailing commercial rate is usually calculated by taking the prime interest rate and adding 1 to 3 percent. *DeNaples v. Comm'r*, T.C. Memo. 2010-171, at *3 n.2 (citing *Hagan*, 713 A.2d at 1191). While the prime interest rate is easily accessible, it would require the Tax Court to reopen the record and introduce new evidence regarding what additional interest rate to apply.[7] Rule 155 does not allow this. To allow the parties to introduce new evidence under the guise that the Tax Court can take judicial notice of it or simply hold the DeNaples responsible for the highest possible rate would invite relitigation of the issue. This is squarely precluded by the Tax Court's rule. Without any evidence of the prevailing commercial rate, the Tax Court's conclusion that the DeNaples had failed to meet their burden of proof is correct.

For these reasons, we hold that the Tax Court did not err in refusing to reopen the record and finding that the DeNaples had failed to meet their burden. Remand to the Tax Court for a recalculation of the deficiency on this basis is unwarranted. Thus, we will affirm the Tax Court's determination as to settlement interest.

---

[7] As the Commissioner argues, recalculation of the settlement amount might require further evidence, such as the fair market value of the property at the time of taking. While we do not necessarily agree, we note that this would only bolster our holding.

18

**III.**

The Decisions and Orders of the United States Tax Court will be affirmed in part and reversed in part. We will remand this matter to the Tax Court for further proceedings consistent with this opinion.